UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STEVEN RICHARDSON,<br><br>Defendant | Criminal No.  24cr10045<br><br>Violation:<br><br>Count One: Conspiracy to Commit Health Care Fraud<br>(18 U.S.C. § 1349)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(7)) |

## INFORMATION

At all times relevant to this Information:

### General Allegations

#### *The Defendant*

1.      Defendant STEVEN RICHARDSON, a resident of Broward County, Florida, was the owner, manager, and operator of Expansion Media, LLC and Hybrid Management Group LLC.

#### *Related Entities*

2.      Expansion Media, LLC ("Expansion") was a purported Florida limited liability company. Expansion was a purported telemedicine company.

3.      Hybrid Management Group LLC ("Hybrid") was a purported Florida limited liability company. Hybrid was a purported telemedicine company.

4.      Beginning in or about March 2016 and continuing through in or about January 2023, STEVEN RICHARDSON owned and operated Expansion and Hybrid.

*The Medicare Program*

5.      The Medicare Program ("Medicare") was a federally funded health insurance program affecting commerce that provided health care benefits to persons who were 65 years of age and older or disabled. The benefits available under Medicare were governed by federal statutes and regulations.

6.      Medicare was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b).

7.      The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services, oversaw and administered Medicare.

8.      Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

9.      Medicare included coverage under component parts. Medicare Part B covered, among other things, physician services, outpatient care, and durable medical equipment ("DME").

10.      Health care providers that provided services to Medicare beneficiaries, including durable medical equipment suppliers, were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

*Durable Medical Equipment*

11.      DME was reusable medical equipment such as orthotic devices, walkers, canes, and hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

2

12.     Medicare reimbursed DME providers for medically necessary items and services rendered to beneficiaries. In claims submitted to Medicare for the reimbursement of DME, providers were required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and provider number of the provider who prescribed or ordered the equipment.

13.     Medicare would pay claims for the provision of DME only if the equipment was ordered by a licensed provider, was reasonable and medically necessary for the treatment of a diagnosed and covered condition, and was provided to a beneficiary. When seeking reimbursement from Medicare, providers submitted, among other things, the appropriate "procedure code," as set forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System ("HCPCS").

14.     Medicare claims were required to be properly documented in accordance with Medicare rules and regulations.

15.     For certain types of orthotics, such as knee braces billed under HCPCS code L1833, Medicare Local Coverage Determinations ("LCDs") required that a provider conduct an in-person examination of a beneficiary and document that examination in the beneficiary's medical record. According to the LCDs, knee braces ordered without a documented in-person examination were not medically necessary and not appropriately reimbursable.

*Telemedicine*

16.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

3

17.     Legitimate telemedicine companies provided telemedicine or telehealth services to individuals by hiring doctors and other health care providers. Legitimate telemedicine companies typically paid doctors a fee to conduct consultations with patients. To generate revenue, legitimate telemedicine companies typically either billed insurance for the consultation, like an office visit, or received payment from patients who utilized the services of the telemedicine company. By contrast, in telemedicine fraud schemes, the telemedicine companies paid based on the number of orders a medical provider reviewed and typically neither billed insurance for office visits nor collected fees from beneficiaries because no legitimate consultation occurred.

18.     Medicare Part B covered expenses for specified telehealth services if certain requirements were met. During much of the relevant period, these requirements included that (a) the beneficiary was located in a rural or heath professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home— during the telehealth service with a remote practitioner. *See* 42 C.F.R. § 410.78(b). During the COVID-19 pandemic, Medicare still required live video or audio communication (depending on the service being provided) between the practitioner and the beneficiary.

<u>Overview of the Conspiracy</u>

19.     From in or about March 2016 and continuing to in or about January 2023, STEVEN RICHARDSON and others known and unknown to the United States conspired to commit health care fraud by: using telemarketers or call centers to obtain medical information from or about Medicare beneficiaries; using that information to prepare medical documentation, including orders, for DME for Medicare beneficiaries that made it appear that medical

4

Case 1:24-cr-10045-NMG   Document 1   Filed 02/15/24   Page 5 of 11

practitioners were providing legitimate consultations to these beneficiaries; recruiting and

facilitating medical practitioners signing these orders without consulting with the beneficiaries;

and arranging for DME suppliers to submit claims to Medicare for orders for DME. These orders

were medically unnecessary, based on false documentation, tainted by kickbacks and bribes, and

otherwise not covered by Medicare. Medicare would have denied these claims had it known the

process by which these claims were generated.

Object and Purpose of the Conspiracy

20.     The object of the conspiracy was to obtain payment from Medicare for claims for

DME that were medically unnecessary, based on false documentation, tainted by kickbacks and

bribes, and that Medicare otherwise would not have reimbursed. The principal purpose of the

conspiracy was for STEVEN RICHARDSON and others known and unknown to the United

States to unlawfully enrich themselves by, among other things, soliciting, offering, paying, and

receiving kickbacks and bribes designed and intended to generate orders and medical records for

DME (collectively "doctors' orders") without regard to medical necessity, accuracy of the

medical orders and records, and whether the DME were eligible for reimbursement, for which

DME companies submitted claims for payment by Medicare and diverted the fraud proceeds for

their personal use and benefit.

Manner and Means of the Conspiracy

21.     Among the manner and means by which STEVEN RICHARDSON and

coconspirators known and unknown to the United States carried out the conspiracy were the

following:

22.     Offering, agreeing to pay, and paying kickbacks and bribes to obtain Medicare

beneficiary information sufficient to create doctor's orders for DME.

5

23.     Soliciting, agreeing to receive, and receiving kickbacks and bribes from telemarketers and telemarketing companies in exchange for doctor's orders for DME that were not medically necessary and not eligible for Medicare reimbursement.

24.     Facilitating the creation of doctor's orders based on Medicare beneficiary information provided by telemarketers, which were designed to make it appear as if the medical practitioner personally examined and treated the Medicare beneficiaries.

25.     Working with medical staffing companies, including a medical staffing company based in the District of Massachusetts, to find medical practitioners willing to order DME.

26.     Paying the medical staffing companies, including transferring payments to a bank account in the District of Massachusetts held in the name of the MA-based medical staffing company, for the orders signed by medical practitioners hired through that medical staffing company.

27.     Medical practitioners signing the orders even though they typically had no relationship with the beneficiaries, were not treating the beneficiaries, and did not conduct a proper telemedicine visit.

28.     Offering, agreeing to pay, and paying kickbacks and bribes to medical staffing companies and medical practitioners in exchange for doctor's orders for DME that were not medically necessary and not eligible for Medicare reimbursement.

29.     Causing DME suppliers to submit approximately $109.8 million in false and fraudulent claims to Medicare, for which Medicare paid approximately $52.5 million, for DME that were (a) induced through kickbacks, bribes, and other illicit incentives; (b) designed for maximum reimbursement and regardless of medical need; (c) not medically necessary; (d) not eligible for reimbursement; and (e) not properly prescribed by a medical practitioner.

30.     Concealing the submission of false and fraudulent claims to Medicare.

31.     Diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

<u>Acts in Furtherance of the Conspiracy</u>

32.     From in or about March 2016 through in or about January 2023, STEVEN RICHARDSON and co-conspirators known and unknown to the United States committed and caused to be committed the following acts, among others, in furtherance of the conspiracy:

    a.      On or about December 26, 2018, STEVEN RICHARDSON caused a transfer of approximately $32,130 from an Expansion bank account ending in x5112 to a Massachusetts-based bank account held by the MA-based medical staffing company.

    b.      On or about May 13, 2019, STEVEN RICHARDSON sent an email to a coconspirator that tracked the status of beneficiary information different marketers had uploaded compared to the number of signed exams that the marketers ordered.

    c.      On or about October 6, 2020, STEVEN RICHARDSON caused a transfer of approximately $45,000 from a Hybrid bank account ending in x4602 to a Massachusetts-based bank account held by the MA-based medical staffing company.

    d.      On or about April 21, 2022, STEVEN RICHARDSON emailed an individual who created a software program that created unsigned medical records and orders with directions on what specific language to include in orders "to stay ahead of audits."

<u>COUNT ONE</u>
Conspiracy to Commit Heath Care Fraud
(18 U.S.C. § 1349)

The Acting United States Attorney charges:

33.     The United States re-alleges and incorporates by reference paragraphs 1-32 of this Information.

34.     From in or about March 2016 through in or about January 2023, in the District of Massachusetts, and elsewhere, the defendant,

STEVEN RICHARDSON,

knowingly and willfully conspired with others known and unknown to the United States to commit health care fraud, that is, to knowingly execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money or property owned by, or under the custody and control of, health care benefit programs, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(7))

The Acting United States Attorney further alleges:

35.     Upon conviction of the offense in violation of Title 18, United States Code,

Section 1349, set forth in Count One, the defendant,

### STEVEN RICHARDSON,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7),

any property, real or personal, that constitutes or is derived, directly or indirectly, from gross

proceeds traceable to the commission of the offense.  The property to be forfeited includes, but

is not limited to, the following assets:

a.  $15,721,854.75 United States currency, to be entered in the form of a forfeiture money judgment;

b.  18 carat rose gold Return to Tiffany Collection Love Heart Lock bracelet size medium, purchased from Tiffany & Co. on or about January 5, 2017;

c.  18 carat yellow gold Square Link necklace, 20 inches, purchased from Tiffany & Co. on or about March 28, 2018;

d.  18 carat yellow gold Square Link necklace, 20 inches, purchased from Tiffany & Co. on or about April 13, 2018;

e.  T Two Collection half-circle diamond hinged bangle size large, purchased from Tiffany & Co. on or about July 15, 2018;

f.  Patek Philippe Grand Complications men's watch (model 5271/11P) with 80 sapphires totaling 5 carats, purchased from Tiffany & Co. on or about October 13, 2018;

g.  Oval diamond, 5.16 carats, E color, Internally Flawless clarity, purchased from Tiffany & Co. on or about October 13, 2018;

h.  18 carat yellow gold narrow hinged Atlas Collection bangle with diamonds size large, purchased from Tiffany & Co. on or about December 4, 2018;

i.  Patek Philippe Gondolo ladies 18 carat white gold watch (model 7099G-001), purchased from Tiffany & Co. on or about December 4, 2018;

j.  Patek Philippe Nautilus watch, 18 carat rose gold with diamonds (model 7014_1R-001), purchased from Tiffany & Co. on or about December 4, 2018;

k.  Platinum half circle round diamond 1.90 total weight, D color, VSS clarity, purchased from Tiffany & Co. on or about March 11, 2019;

l.  Patek Philippe Nautilus watch, Men's 18 carat white gold diamond watch (model 5724G-001), purchased from Tiffany & Co. on or about April 4, 2019;

m.  18 carat yellow gold X cuff bracelet, purchased from Tiffany & Co. on or about December 24, 2021; and

n.  18 carat rose gold Atlas Collection closed pendant with pave diamonds, purchased from Tiffany & Co. on or about December 24, 2021;

36.   If any of the property described in Paragraph 35, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendant --

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property described in Paragraph 38 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

JOSHUA S. LEVY
Acting United States Attorney
District of Massachusetts


*/s/ Howard Locker*
ALEXANDRA BRAZIER
LAUREN GRABER
HOWARD LOCKER
LINDSEY ROSS
Assistant United States Attorneys
District of Massachusetts

February 15, 2024

11