

U.S. Department of Justice

*Joshua S. Levy*
*Acting United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

October 24, 2023

Joshua Sabert Lowther, Esq.
Lowther Walker LLC
101 Marietta Street, NW, Suite 3325
Atlanta, GA 30303

      Re:   United States v. Steven Richardson
              Criminal No. 24-cr-10045

Dear Attorney Lowther:

The Acting United States Attorney for the District of Massachusetts (the "U.S. Attorney") and your client, Steven Richardson ("Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

    1.    Change of Plea

Defendant will waive Indictment and plead guilty to count 1 of the Information: conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. Defendant admits that Defendant committed the crime specified in this count and is in fact guilty.

Defendant agrees to the accuracy of the attached statement of facts.

    2.    Penalties

Defendant faces the following maximum penalties: incarceration for ten years; supervised release for three years; a fine of $250,000 or twice the gross pecuniary gain or loss, whichever is greater; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

1

3. <u>Sentencing Guidelines</u>

The parties agree, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 36:

   a) Defendant's base offense level is 6 because the offense has a statutory maximum term of imprisonment of less than 20 years (USSG § 2B1.1(a)(2));

   b) Defendant's offense level is increased by 24 because Defendant's intended loss was more than $65,000,000 and less than $150,000,000 (USSG § 2B1.1(b)(1)(M));

   c) Defendant's offense level is increased by 4 because Defendant's offense is a Federal health care offense involving a Government health care program and the loss was more than $20 million (USSG § 2B1.1(b)(7)(B)(iii));

   d) Defendant's offense level is increased by 2 because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means (USSG § 2B1.1(b)(10)(C));

   e) Defendant's offense level is increased by 3 because the Defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive (USSG § 3B1.1(b)); and

   f) Defendant's offense level is decreased by 3 because Defendant has accepted responsibility for Defendant's crime (USSG § 3E1.1).

If (a) the proposed United States Sentencing Guideline § 4C1.1 (Adjustment for Certain Zero-Point Offenders) ("Proposed Guideline 4C1.1") becomes effective prior to Defendant's sentencing hearing; (b) U.S. Probation determines that Defendant does not receive any criminal history points, and (c) the United States determines that Defendant otherwise meets the criteria in Proposed Guideline 4C1.1, the United States will recommend that Defendant's offense level be reduced by two levels pursuant to 4C1.1. If proposed guideline 4C1.1 is not yet effective at the time of Defendant's sentencing, but above criteria (b) and (c) are met, the United States will recommend that the Defendant receive a two-level downward variance pursuant to 18 U.S.C. § 3553(a). In exchange for the variance recommendation, Defendant agrees to not seek a further reduced sentence based on Proposed Guideline 4C1.1 when it becomes effective.

Defendant understands that the Court is not required to follow this calculation or even to sentence Defendant within the Guidelines and that Defendant may not withdraw Defendant's guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the government will object to any reduction in Defendant's sentence based on acceptance of responsibility if: (a) at sentencing, Defendant (directly or through

counsel) indicates that Defendant does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crime to which Defendant is pleading guilty; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category is reduced, the U.S. Attorney reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.      Sentence Recommendation

The U.S. Attorney agrees to recommend the following sentence to the Court:

a) incarceration at the low end of the Guidelines sentencing range, as calculated by the parties in Paragraph 3;

b) a fine within the Guidelines sentencing range as calculated by the parties in Paragraph 3, unless the Court finds that Defendant is not able, and is not likely to become able, to pay a fine;

c) 18 months of supervised release;

d) a mandatory special assessment of $100, which Defendant must pay to the Clerk of the Court by the date of sentencing;

e) restitution of $52,500,583.15; and

f) forfeiture as set forth in Paragraph 6.

Based on the factors set forth in 18 U.S.C. § 3553(a), Defendant is free to recommend whatever sentence he deems appropriate as to incarceration, fine, and supervised release. Defendant agrees with the U.S. Attorney's recommendation of the mandatory special assessment, restitution, and forfeiture.

Defendant agrees that all criminal monetary penalties, including special assessment, restitution, forfeiture, and/or fine imposed shall be due and payable immediately, and further agrees that any Court-ordered repayment schedule does not preclude further enforcement or collection by the United States.

5. <u>Waiver of Appellate Rights and Challenges to Conviction or Sentence</u>

Defendant has the right to challenge Defendant's conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that Defendant's conviction or sentence should be overturned.

Defendant understands that Defendant has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

a) Defendant will not challenge Defendant's <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

b) Defendant will not challenge Defendant's <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

Defendant understands that, by agreeing to the above, Defendant is agreeing that Defendant's conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge Defendant's conviction and sentence, regardless of whether Defendant later changes Defendant's mind or finds new information that would have led Defendant not to agree to give up these rights in the first place.</u>

Defendant is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that Defendant's lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in misconduct serious enough to entitle Defendant to have Defendant's conviction or sentence overturned.

6. <u>Forfeiture</u>

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

4

The assets to be forfeited specifically include, without limitation, the following:

a. $15,721,854.75 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

b. 18 carat rose gold Return to Tiffany Collection Love Heart Lock bracelet size medium, purchased from Tiffany & Co. on or about January 5, 2017;

c. 18 carat yellow gold Square Link necklace, 20 inches, purchased from Tiffany & Co. on or about March 28, 2018;

d. 18 carat yellow gold Square Link necklace, 20 inches, purchased from Tiffany & Co. on or about April 13, 2018;

e. T Two Collection half-circle diamond hinged bangle size large, purchased from Tiffany & Co. on or about July 15, 2018;

f. Patek Philippe Grand Complications men's watch (model 5271/11P) with 80 sapphires totaling 5 carats, purchased from Tiffany & Co. on or about October 13, 2018;

g. Oval diamond, 5.16 carats, E color, Internally Flawless clarity, purchased from Tiffany & Co. on or about October 13, 2018;

h. 18 carat yellow gold narrow hinged Atlas Collection bangle with diamonds size large, purchased from Tiffany & Co. on or about December 4, 2018;

i. Patek Philippe Gondolo ladies 18 carat white gold watch (model 7099G-001), purchased from Tiffany & Co. on or about December 4, 2018;

j. Patek Philippe Nautilus watch, 18 carat rose gold with diamonds (model 7014_1R-001), purchased from Tiffany & Co. on or about December 4, 2018;

k. Platinum half circle round diamond 1.90 total weight, D color, VSS clarity, purchased from Tiffany & Co. on or about March 11, 2019;

l. Patek Philippe Nautilus watch, Men's 18 carat white gold diamond watch (model 5724G-001), purchased from Tiffany & Co. on or about April 4, 2019;

m. 18 carat yellow gold X cuff bracelet, purchased from Tiffany & Co. on or about December 24, 2021; and

n. 18 carat rose gold Atlas Collection closed pendant with pave diamonds, purchased from Tiffany & Co. on or about December 24, 2021;

Defendant admits that $15,721,854.75 is subject to forfeiture on the grounds that it is equal to the amount of gross proceeds the defendant derived from the offense.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents gross proceeds the Defendant obtained (directly or indirectly), and/or facilitating property and/or property involved in, the crimes to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty. Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

If the U.S. Attorney requests, Defendant shall deliver to the U.S. Attorney within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control, or has had any legal or beneficial interest. Defendant further agrees to be deposed with respect to Defendant's assets at the request of the U.S. Attorney. Defendant agrees that the United States Department of Probation may share any financial information about the Defendant with the United States Attorney's Office.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

7.      Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to Defendant's criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

8. <u>Breach of Plea Agreement</u>

Defendant understands that if Defendant breaches any provision of this Agreement, violates any condition of Defendant's pre-trial release or commits any crime following Defendant's execution of this Plea Agreement, Defendant cannot rely upon such conduct to withdraw Defendant's guilty plea. Defendant's conduct, however, would give the U.S. Attorney the right to be released from the U.S. Attorney's commitments under this Agreement, to pursue any charges that were, or are to be, dismissed under this Agreement, and to use against Defendant any of Defendant's statements, and any information or materials Defendant provided to the government during investigation or prosecution of Defendant's case—even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Defendant also understands that if Defendant breaches any provision of this Agreement or engages in any of the aforementioned conduct, Defendant thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

9. <u>Who is Bound by Plea Agreement</u>

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

10. <u>Modifications to Plea Agreement</u>

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

\*   \*   \*

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Howard Locker.

Sincerely,

JOSHUA S. LEVY
Acting United States Attorney

By: *[signature]*

KELLY BEGG LAWRENCE
Chief, Health Care Fraud Unit
PATRICK CALLAHAN
Deputy Chief, Health Care Fraud Unit

*[signature]*

Alexandra Brazier
Lauren Graber
Howard Locker
Lindsey Ross
Assistant U.S. Attorneys

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crime I am pleading guilty to, and the maximum penalties for that crime. I have discussed the Sentencing Guidelines with my lawyer, and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me, and we have had enough time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest.

_____
Steven Richardson
Defendant

Date: 11-3-23

I certify that Steven Richardson has read this Agreement and that we have discussed what it means. I believe Steven Richardson understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

_____
Joshua Sabert Lowther, Esq.
Attorney for Defendant

Date: November 3, 2023

9

## STATEMENT OF FACTS

From in or around March 2016 through in or around January 2023, in Essex County, the District of Massachusetts, and elsewhere, the defendant, STEVEN RICHARDSON ("RICHARDSON"), knowingly and willfully conspired and agreed with his co-conspirators to commit health care fraud, in violation of Title 18, United States Code, Section 1349, that is (a) to knowingly and willingly execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347. Medicare was a "health care benefit program" as defined in Title 18, United States Code, Section 24. Further, Medicare was a health care benefit program affecting commerce.

RICHARDSON, a resident of Broward County, Florida, owned and operated Expansion Media, LLC ("Expansion") and Hybrid Management Group LLC ("Hybrid"), which were purported telemedicine businesses.

Through the telemedicine businesses, between in or around March 2016 through in or around January 2023, RICHARDSON entered into agreements with telemarketers whereby RICHARDSON, through Expansion and Hybrid, caused Medicare beneficiary identifying and medical information ("Medicare beneficiary information") to be transformed into medical records containing the Medicare beneficiary information collected by the telemarketers that purportedly reflected a visit between the beneficiary and medical practitioner (such as doctors and nurse practitioners) that had yet to occur, and generally never occurred. RICHARDSON also caused the

1

creation of medical orders for durable medical equipment ("DME") using the Medicare beneficiary information for the items and services specified by the telemarketers, not by the medical practitioner.

Further, RICHARDSON understood that the Medicare beneficiary information he received derived primarily from telemarketing campaigns during which marketers contacted Medicare beneficiaries and induced them to accept DME.

RICHARDSON worked with medical staffing companies, including a medical staffing company based in Massachusetts ("MA Medical Staffing Company") to find dozens of medical practitioners willing to review and sign these orders.

The medical practitioners that RICHARDSON arranged to work on behalf of Expansion and Hybrid did not comply with Medicare's requirements for telemedicine consultations, did not have a legitimate patient-physician relationship with the beneficiaries, and often authorized the medical items and services without even speaking with the beneficiaries—and many times without even reading the orders and records they signed. RICHARDSON paid the MA Medical Staffing Company based on the volume of beneficiary charts each medical practitioner reviewed. RICHARDSON caused payments to the MA Medical Staffing Company to be made by transferring funds from accounts held by Expansion and Hybrid to a Massachusetts-based account held by the MA Medical Staffing Company. The MA Medical Staffing Company then paid each Expansion and Hybrid medical practitioner on the same basis, but at a lesser rate, keeping the difference for itself.

Through his companies, in exchange for kickbacks and bribes, RICHARDSON sold the doctor's orders to telemarketers and other individuals working on behalf of telemarketers or DME suppliers who, as RICHARDSON knew, sold them to DME suppliers. As RICHARDSON knew,

2

the DME suppliers used the doctors' orders to submit claims to Medicare.

Some of the telemarketers and telemarketing companies to which RICHARDSON sold doctors' orders in exchange for kickbacks and bribes include:

| Source of Payments | Approximate Amount of Payments Received by Expansion/Hybrid |
|---|---|
| Purported Corporation with an address in Monroe County, Mississippi | $5,634,409 |
| Delaware Limited Liability Company whose officer has the initials JL | $3,655,460 |
| Florida Limited Liability Company whose registered agent has the initials PM | $1,578,565 |
| Florida Limited Liability Company whose registered agent has the initials JZ | $1,521,075 |
| Florida Limited Liability Company whose registered agent has the initials DO | $548,750 |
| Florida Corporation whose registered agent has the initials PS | $447,100 |
| Florida Corporation whose registered agent has the initials KH | $315,000 |
| Florida Limited Liability Company whose registered agent has the initials RP | $314,000 |

RICHARDSON and his co-conspirators performed many acts in furtherance of the scheme, including:

    a.    On or about December 26, 2018, RICHARDSON caused a transfer of approximately $32,130 from Expansion account ending in x5112 to a Massachusetts-based bank account held by the MA Medical Staffing Company.

    b.    On or about May 13, 2019, RICHARDSON sent an email to a coconspirator that tracked the status of beneficiary information different marketers had uploaded compared to the number of signed exams that the marketers ordered.

      c.      On or about October 6, 2020, RICHARDSON caused a transfer of approximately $45,000 from Hybrid account ending in x4602 to a Massachusetts-based bank account held by the MA Medical Staffing Company.

      d.      On or about April 21, 2022, RICHARDSON emailed an individual who created a software program that created unsigned medical records and orders with directions on what specific language to include in orders "to stay ahead of audits."

RICHARDSON took many steps to conceal his role in the scheme, including switching company names, creating and using fictitious company names, creating and using a number of email accounts tied to those fictitious company names, deleting records pertaining Hybrid and Expansion, and using pass-through entities for payment from telemarketing companies.

As a result of RICHARDSON's participation in the conspiracy, between March 2016 and January 2023, various DME suppliers submitted approximately $109,847,151 in claims to Medicare, for which Medicare paid approximately $52,500,583. During part of this period, the scheme resulted in some fraudulent claims submitted to private insurers. RICHARDSON acknowledges that the approximate amount of proceeds that Expansion and Hybrid received from marketing companies as a result of this scheme is $15,721,854.75.

**CERTIFICATE OF SERVICE**

     I hereby certify that this document filed today via ECF will also be sent electronically to counsel for the defendant.

                                                */s/ Howard Locker*
                                                Howard Locker
                                                Assistant United States Attorney

February 15, 2024